IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

SOUTHERN UTAH WILDERNESS
ALLIANCE, a Utah non-profit
corporation,

          Plaintiffs,

v.

NATIONAL PARK SERVICE et al.

          Defendants,

and

UTAH SHARED ACCESS ALLIANCE
et al.,

          Defendant-Intervenors.

MEMORANDUM DECISION AND
ORDER

Case No. 2:95CV559DAK

This matter is before the court on Defendant-Intervenors Utah Shared Access Alliance,

Blue Ribbon Coalition, High Desert Multiple Use Coalition, United Four Wheel Drive

Associations of U.S. and Canada, and Historic Access Recovery Project's (collectively "USA-

ALL) Administrative Appeal of the National Park Service's ("NPS") Final Rule.  The Final

Rule, which is codified at 36 C.F.R. § 7.44, amends the NPS's regulations for Canyonlands

National Park by prohibiting motor vehicles in Salt Creek Canyon above the Peekaboo campsite.

A hearing on the Administrative Appeal was held on May 24, 2005.  At the hearing, USA-ALL

was represented by Hal Pos and Alison Roberts, Plaintiff Southern Utah Wilderness Alliance

("SUWA") was represented by Steven Bloch, and Defendants National Park Service *et al*. ("NPS") were represented by Carlie Christensen and Bruce Bernard.  Before the hearing, the court carefully considered the memoranda and other materials submitted by the parties.  Since taking the motion under advisement, the court has further considered the law and facts relating to the motion.  Now being fully advised, the court renders the following Memorandum Decision and Order.

## INTRODUCTION

The parties to this action have been litigating the issue of whether motorized vehicles should be allowed on the portion of Salt Creek Road leading from the Peekaboo campsite to Angel Arch for a decade.  On June 14, 2004, the NPS issued a Final Rule amending its regulations for Canyonlands National Park to completely prohibit motor vehicle use in Salt Creek Canyon above Peekaboo campsite.  The Final Rule constitutes a change in position from the NPS's 1995 Backcountry Management Plan ("BMP"), which implemented a permit system limiting the number of motor vehicles allowed on the Salt Creek Road above Peekaboo Springs to twelve vehicles daily.

In implementing the BMP, the NPS chose not to prohibit motor vehicle use on Salt Creek Road, even though such a prohibition was the preferred alternative in its Environmental Assessment.  The NPS instead implemented the permit system, finding that the Organic Act and the Canyonlands Enabling Act (the "Enabling Act") require a balancing between competing mandates of resource conservation and visitor enjoyment, and the permit system represented a reasonable accommodation of these conflicting mandates where a complete prohibition on motor

2

vehicle use would not.  Unlike the BMP, the Final Rule implements the NPS's Environmental

Assessment's preferred alternative by completely prohibiting motor vehicle use above Peekaboo

campsite.  The NPS justifies this change in position by relying on its 2001 Management Policies,

which interpret the Organic Act as placing an overarching concern on preservation of resources

where there is a conflict between conserving resources and providing for the enjoyment of them.


      USA-ALL disagrees with the NPS's interpretation of the Organic Act and alleges that the

Final Rule violates both the Organic Act and the Enabling Act because it deprives members of

the public the ability to use and enjoy significant portions of Salt Creek Canyon.  USA-ALL has

moved the court to set aside the Final Rule and order the NPS to manage Salt Creek Road in

accordance with the permit system established in the 1995 BMP.   For the following reasons, the

court denies USA-ALL's request.

## **BACKGROUND**

*Canyonlands National Park*

      The national park system began with the establishment of Yellowstone National Park in

1872.  In 1916, Congress passed the National Park Service Organic Act of 1916 (the "Organic

Act"), 16 U.S.C. § 1, *et seq*.  The Organic Act created the National Park Service ("NPS"), a new

bureau within the Department of the Interior, for the purpose of:

> promot[ing] and regulat[ing] the use of the Federal areas known as national parks,
> monuments, and reservations hereinafter specified . . . by such means and
> measures as conform to the fundamental purpose of the said parks, monuments,
> and reservations, which purpose is to conserve the scenery and the natural and
> historic objects and the wild life therein and to provide for the enjoyment of the

same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations.

16 U.S.C. § 1.

Congress created Canyonlands National Park ("Canyonlands") in 1964 in order to "preserve an area in the State of Utah possessing superlative scenic, scientific, and archaeologic features for the inspiration, benefit, and use of the public . . . ."  16 U.S.C. § 271.

*Salt Creek Canyon*

Salt Creek Canyon, which is located within the Needles District of Canyonlands, supports the most extensive riparian ecosystem in Canyonlands, other than the Colorado and Green Rivers.  Salt Creek itself begins on the north side of the Abajo Mountains in the Manti-LaSal National Forest, approximately five miles from the southern boundary of the Park.  From this boundary, the creek runs northerly about 32 miles where it joins the Colorado River.  Sections of Salt Creek have year-round surface water, supported by several springs.  In other sections surface flow is intermittent, resulting form spring snowmelt and storm runoff.  The Salt Creek Road is an unpaved and ungraded jeep trail that runs in and out of Salt Creek.  In various places, the road is the creek bed.  NPS maintenance of the road is limited to occasional grading or filling of sections that have become impassable due to flooding or erosion from vehicle travel.  To navigate this road safely, a high clearance four-wheel drive vehicle and some experience in four-wheeling, or the participation in a commercially guided tour, is necessary.  Because of the condition of the road, vehicles using the road periodically break down or become stuck,  requiring NPS assistance for removal.  There have been instances where vehicles have

lost transmission, engine, or crankcase fluids in Salt Creek's water.  There is no practical way to reroute the road to avoid the watercourse.

A tributary canyon to Salt Creek contains a well-known landmark, Angel Arch.  Angel Arch is a popular destination among four-wheel drivers.  The Salt Creek Road is the only means of vehicular access to Angel Arch.

*Backcountry Management Plan*

Between 1984 and 1992, the number of annual visitors to Canyonlands quadrupled.  The increase in visitation directly resulted in an increase of adverse impacts to Canyonlands' resources and diminishment in the quality of visitor experience.  In response, the NPS began developing a new Backcountry Management Plan ("BMP").  The purpose of the BMP was to "develop backcountry management strategies to protect park resources, provide for high quality visitor experiences, and be flexible to deal with changing conditions."

On December 18, 1993, the NPS released a draft management plan and environmental assessment ("EA")[1] that addressed, among other things, the impacts of the use of Salt Creek Road by four-wheel drive vehicles.  The EA assessed various alternatives, including closing the entire road to vehicle use, closing a portion of the road to vehicle use, and a no-action alternative allowing continued unrestricted use of the road.  The EA identified the NPS's preferred alternative as closing the road to vehicles beyond Peekaboo campsite, leaving the approximately

---

[1] Titled "Canyonlands National Park and Orange Cliffs Unit of Glen Canyon National Recreation Area Environmental Assessment for Backcountry Management Plan."

ten miles to Angel Arch to be traversed by foot.  Comments on the draft management plan and EA were accepted until March 5, 1994.

On January 6, 1995, the NPS released the final BMP.  The final BMP did not completely close the ten-mile portion of Salt Creek Road to motor vehicles.  Instead, because of the popularity of four-wheel drive travel on Salt Creek Road, the NPS decided to close a one-half mile segment of the road and leave the remainder of the road open to vehicles on a limited permit system.  Specifically, the BMP provided that day-use permits for Salt Creek Canyon would be limited to ten permits for private motor vehicles and two permits for commercial motor vehicle tours per day.

*District Court Decision*

On June 22, 1995, SUWA filed the above-captioned action challenging the NPS's implementation of the BMP.  USA-ALL, a combination of groups supporting four-wheel drive vehicle recreation, intervened as defendants.  The parties subsequently filed cross-motions for summary judgment.  Among other things, SUWA alleged in its motion that continued vehicular use of Salt Creek Road would cause impairment of unique park resources and thus would violate the Organic Act and Enabling Act.

As to Salt Creek Canyon, the court granted summary judgment in favor of SUWA.  The court determined that the Organic Act unambiguously prohibits activities in national parks that would permanently impair unique park resources.  The court then further concluded that the motorized vehicle use of Salt Creek Road from Peekaboo Spring to Angel Arch would cause significant, permanent impairment to unique park resources in violation of the Organic Act.  *See*

*Southern Utah Wilderness Alliance v. Dabney*, 7 F. Supp. 2d 1205 (D. Utah 1998).  The court consequently entered a final judgment on September 23, 1998, enjoining the NPS from permitting motorized vehicle travel in Salt Creek Canyon above the Peekaboo campsite.

*Tenth Circuit Decision*

USA-ALL appealed this court's June 1998 decision to the United States Court of Appeals for the Tenth Circuit.  On August 15, 2000, the Court of Appeals reversed the district court decision and remanded it for further consideration.  The Court of Appeals determined that the Organic Act's phrase "unimpaired for the enjoyment of future generations" is inherently ambiguous.  Accordingly, the Court of Appeals found that the district court erred in finding that step one of *Chevron U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 842-43 (1984), was determinative with respect to the issue of vehicle access on the ten-mile segment of Salt Creek Road.  The Court of Appeals held that the analysis must instead proceed under step two of *Chevron*.

The Court of Appeals agreed with the district court that the Organic Act prohibited the NPS from permitting "significant, permanent impairment."  The Court of Appeals, however, disagreed that the administrative record was clear concerning whether motorized vehicle travel in Salt Creek would cause permanent impairment to park resources.  The Court of Appeals recognized that the Organic Act may also prohibit negative impacts that do not rise to the level of "significant, permanent impairment."  The Court of Appeals therefore remanded the case to the district court with instructions for the court to re-examine the evidence in the record regarding impairment, and to analyze under step two of *Chevron* whether the evidence

demonstrates the level of impairment prohibited by the Act, which level may be broader than

"significant, permanent impairment."  The Court of Appeals additionally predicted that the NPS

may formally adopt an interpretation of the Organic Act by the time of trial, and so instructed the

district court to determine on remand the weight to be given any interpretation of the Organic

Act formally adopted by the NPS.  The Court of Appeals then vacated the district court's

injunction order enjoining the NPS from permitting motorized vehicle travel in Salt Creek

Canyon above Peekaboo Spring.

*2001 Management Policies*

While this case was pending before the Court of Appeals, the NPS commenced a revision

of its Management Policies.  On January 19, 2000, a draft of the proposed revisions to the

Management Policies was issued for a 60-day public review and comment period.  *See* Notice of

Availability of Draft National Park Service Management Policies, 65 Fed. Reg. 2984 (Jan. 19,

2000).  The comment period closed on September 15, 2000.  On September 15, 2000, the NPS

published a notice of its new policy interpreting the NPS Organic Act.  See Notice of New

Policy Interpreting the National Park Service Organic Act, 65 Fed. Reg. 56,003 (Sept. 15, 2000).

The Notice explained that the NPS had considered all the public comments received during the

comment period and that the NPS had decided to adopt the Management Policies in the future.

As of that date, however, the NPS adopted section 1.4 of the Management Policies, which

clarified the NPS's interpretation of the statutory provision in the Organic Act prohibiting the

impairment of park resources.

Section 1.4 of the 2001 Management Policies defines the "impairment" prohibited by the Organic Act as "an impact that, in the professional judgment of the responsible NPS manager, would harm the integrity of the park resources or values, including the opportunities that otherwise would be present for the enjoyment of those resources or values." § 1.4.5, 2001 Management Policies (hereinafter referred to as the "Impairment Definition" or "Section 1.4"). Whether an impact meets this definition "depends on the particular resources and values that would be affected; the severity, duration, and timing of the impact; the direct and indirect effects of the impact; and the cumulative effects of the impact in question and other impacts." *Id.* The Management Policies then set forth a definition of what constitutes park resources and values. *Id.* § 1.4.6.

*2002 Environmental Assessment*

This court's September 22, 1998 Order, which prohibited motor vehicle use, was the beginning of the first period of significant length–since the inception of Canyonlands–that vehicles had not traveled on the Salt Creek Road between the Peekaboo campsite and Angel Arch. This extended prohibition on vehicular use made it possible for the NPS, as well as independent researchers, to monitor Salt Creek's riparian conditions when not subject to motor vehicle use. In light of the new scientific information gathered during this period, and in light of the NPS's new Management Policies, the NPS decided to conduct a new Environmental Assessment for Salt Creek Canyon.

Consequently, on October 23, 2000, the NPS issued a "Temporary Prohibition of Motorized Vehicles," accompanied by a "Letter of Determination" (collectively "Closure Order

9

I"), which temporarily closed the Salt Creek Road to motor vehicles above the Peekaboo campsite.  The NPS announced that the closure would stay in effect until they could complete a formal rulemaking process which would consider an interim prohibition of vehicles on Salt Creek Road above Peekaboo campsite for the period of time it would take to conduct a new Environmental Assessment.

The NPS subsequently initiated an environmental assessment process in accordance with NEPA in order to analyze the impacts of a range of alternatives for recreational access to Salt Creek Canyon.  This court stayed its proceedings on remand until completion of the Environmental Assessment.  This June 2002 Environmental Assessment, Middle Salt Creek Canyon Access Plan ("Salt Creek EA") analyzed in detail four alternatives.  "Alternative A" allowed year-round vehicle travel subject to the permit system set forth in the BMP, "Alternative B" allowed part-year vehicle travel subject to the permit system set forth in the BMP, "Alternative C" realigned portions of the road to avoid the streambed and riparian area where feasible and allowed year-round vehicle travel subject to the permit system set forth in the BMP, and "Alternative D" prohibited year-round all motor vehicle travel above Peekaboo campsite but continued to allow hiking and pack/saddle stock travel.  The NPS determined that Alternative D was the environmentally preferred alternative.

The Salt Creek EA was made available for public review and comment in June of 2002. Approximately 7,300 comments were received.  Over ninety percent of the comments favored the EA's preferred alternative of prohibiting all motor vehicle use.  On September 26, 2002, the NPS issued a Finding of No Significant Impact ("FONSI") on the Salt Creek EA.  The FONSI

10

determined that Alternatives A-C each caused impairment of park resources and values in violation of the Organic Act.  Alternative D, which was found not to impair key resources or values, was therefore selected in the FONSI for implementation.

*Final Rule*

On August 11, 2003, the NPS issued a Proposed Rule to amend its regulations for Canyonlands by prohibiting motor vehicles on Salt Creek Road above the Peekaboo campsite. 68 Fed. Reg. 47,524-527 (Aug. 11, 2003).  This proposed rule implemented the Salt Creek EA's selected alternative.  *Id.*  Members of the public were given until October 10, 2003 to submit written comments.  The NPS received comments on the proposed rule from over 2,800 individuals and 25 organizations.  Over ninety-seven percent of the comments supported the proposed rule.

On June 14, 2004, the NPS issued a Final Rule amending the NPS's regulations for Canyonlands by prohibiting motor vehicles on Salt Creek Road above the Peekaboo campsite. 69 Fed. Reg. 32,871 (June 14, 2004) (codified at 36 C.F.R. § 7.44).

*District Court Proceedings on Remand*

On August 13, 2004, the Defendant-Intervenors, USA-ALL, filed a Second Amended Cross-Claim against the NPS seeking judicial review of the NPS's Final Rule.  USA-ALL alleges that the Final Rule violates both the Organic Act and Enabling Act because it deprives members of the public the ability to use and enjoy significant portions of Canyonlands, including Angel Arch.  USA-ALL also alleges that the NPS's Management Policies violate the Organic Act because they establish a "no-impairment" standard, with use and enjoyment of the Park

being a secondary consideration.  USA-ALL lastly alleges that the Final Rule is arbitrary and capricious, as the administrative record does not support the "findings" the NPS relied upon in issuing the Final Rule.

## STANDARD OF REVIEW

When the question before the court involves an agency's interpretation of a statute it administers, the court utilizes the two-step approach announced in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984), which states:

> First, always, is the question whether Congress has directly spoken to the precise question at issue.  If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.  If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation.  Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Chevron*, 467 U.S. at 842-43.

Under the Administrative Procedure Act ("APA"), "[i]nformal agency action must be set aside if it fails to meet statutory, procedural or constitutional requirements or if it was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1573-74 (10th Cir. 1994) (internal quotations omitted); 5 U.S.C. § 706(2).

## DISCUSSION

USA-ALL claims that the NPS's Final Rule, which prohibits motor vehicle use in Salt

Creek Canyon above Peekaboo campsite, violates the 1916 National Park Service Organic Act

(the "Organic Act"), as amended by the 1978 "Redwoods Amendments."  The relevant provision

of the Organic Act provides that the NPS is to "regulate the use" of national parks by means that

conform to their "fundamental purpose," namely:

> to conserve the scenery and natural historic objects and the wildlife therein and to
> provide for the enjoyment of the same in such manner and by such means as will
> leave them unimpaired for the enjoyment of future generations.

16 U.S.C. § 1 (the "no-impairment mandate").  A provision added in 1978 prohibits the

authorization of activities that derogate park values:

> The authorization of activities shall be construed and the protection, management, and
> administration of these areas shall be conducted in light of the high public value and
> integrity of the National Park System and shall not be exercised in derogation of the
> values and purposes for which these various areas have been established, except as may
> have been or shall be directly and specifically provided by Congress.

16 U.S.C. § 1a-1.

The Enabling Act, which created Canyonlands, identifies that park's unique values and

purposes.  That legislation provides:

> In order to preserve an area in the State of Utah possessing superlative scenic,
> scientific, and archaeologic features for the inspiration, benefit, and use of the
> public, there is hereby established the Canyonlands National Park . . . .

16 U.S.C. § 271.  The Enabling Act also mandates that Canyonlands be administered, protected,

and developed in accordance with the purposes of the Organic Act.  16 U.S.C. § 271(d).

USA-ALL asserts that the Organic Act and its amendments authorize a balancing

between competing mandates of resource conservation and visitor enjoyment and that the Final

Rule violates the Organic Act and the Enabling Act because it deprives the public of its ability to

use and enjoy significant portions of Canyonlands.

The NPS, on the other hand, asserts that its primary responsibility pursuant to the

Organic Act is to prevent the impairment of park resources and values.  The NPS claims that

because motor vehicle use in Salt Creek will impair park resources key to the natural integrity of

the park, the Final Rule prohibiting such use is a permissible interpretation of the Organic Act

and should be accorded deference.

Accordingly, because the issue before the court involves the NPS's interpretation of a

statute it administers, the precise question before the court is whether the Final Rule, which

prohibits motor vehicle use in Salt Creek Canyon above Peekaboo campsite, is inconsistent with

a clear intent of Congress expressed in the Organic Act and the Enabling Act.  *See Southern*

*Utah Wilderness Alliance v. Dabney*, 222 F.3d 819, 826 (10th Cir. 2000).  Because of the

ambiguity inherent in the Organic Act's "no-impairment" mandate, the court cannot resolve this

question under step one of *Chevron* and instead must look to step two.  *See Dabney*, 222 F.3d at

828.  The question for the court under step two of *Chevron* is "whether the agency's answer is

based on a permissible construction of the statute."  *Chevron*, 467 U.S. at 843, 104 S. Ct. 2778.

"To resolve this question, we must first determine what the agency's position is."  *Dabney*, 222

F.3d at 827.

In *Dabney*, the NPS's position relied upon its new construction of the Organic Act's "no-

impairment" mandate set forth in the NPS's Draft Management Policies.  Because the

Management Policies had not been finalized or adopted by the agency, the Court of Appeals

accorded them no deference. *Dabney*, 222 F.3d 829.  However, the NPS finalized and adopted

the Management Policies in 2001, and relied upon the Management Policies' construction of the

"no-impairment" mandate in implementing the Final Rule.  Because Section 1.4 of the

Management Policies was relied upon by the NPS in implementing the Final Rule, it is part of

the NPS's "position."  The court accordingly first determines whether the Management Policies

violate the Organic Act.

## I.     NPS'S 2001 MANAGEMENT POLICIES

The Management Policies, specifically Section 1.4 of the Management Policies,

constitute the NPS's interpretation of the Organic Act's "no-impairment mandate."  As stated

previously, the "no-impairment" mandate is inherently ambiguous.  Before addressing "whether

the agency's answer is based on a permissible construction of the statute," *Chevron*, 467 U.S. at

843, 104 S. Ct. 2778, the court must determine whether the Management Policies "have been

expressed in a binding format through the agency's congressionally delegated power."  *Dabney*,

222 F.3d 819, 829 (finding that agency policy statements do not usually warrant deference under

step two of *Chevron*).

### A.     *The 2001 Management Policies Are the Type of Agency Decision Intended to Carry the Force of Law.*

USA-ALL asserts that the 2001 Management Policies are not entitled to *Chevron*

deference because they were not finalized and adopted pursuant to formal rulemaking

procedures.  In making this assertion, USA-ALL relies on the Tenth Circuit's instruction in

*Dabney* that, on remand, this court should not accord the NPS's Draft Management Policies

15

*Chevron* deference unless they are "finalized and adopted pursuant to the requisite rulemaking procedures, and then construed as substantive or legislative rules . . . ." *Dabney*, 222 F.3d at 828.   In formulating its instruction, the *Dabney* court relied upon *Christensen v. Harris County*, 529 U.S. 576, 120 S. Ct. 1655, 146 L. Ed. 2d 621 (2000), which held that agency interpretations not arrived at after formal adjudication or notice-and-comment rulemaking did not warrant *Chevron* deference. *Id.*

Since *Dabney* was decided, however, the Supreme Court has made clear that an agency interpretation reached through means less formal than notice-and-comment rulemaking can be entitled to *Chevron* deference.  In *United States v. Mead Corp.*, 533 U.S. 218, 121 S. Ct. 2164, 150 L. Ed. 2d 292 (2001), the Court held that *Chevron* deference is warranted when Congress has delegated to the agency authority "generally to make rules carrying the force of law, and . . . the agency interpretation claiming deference was promulgated in the exercise of that authority." *Mead*, 533 U.S. at 226-27, 121 S. Ct. 2164.

The Court noted that delegation of such authority "may be shown in a variety of ways, such as by an agency's power to engage in adjudication or notice-and-comment rulemaking, or by some other indication of a comparable congressional intent."  *Id.* at 227, 121 S. Ct. 2164. "Congress contemplates administrative action with the effect of law when it provides for a relatively formal administrative procedure tending to foster the fairness and deliberation that should underlie a pronouncement of such force."  *Id.* at 230, 121 S. Ct. 2164.  While notice-and-comment rulemaking is therefore a good indicator that *Chevron* deference is warranted, the absence of such a procedure does not alone "bar the application of *Chevron*."  *Id.* at 230-31, 121

16

S. Ct. 2164.  *See also Barnhart v. Walton*, 535 U.S. 212, 122 S. Ct. 1265, 152 L. Ed. 2d 330 (2002).[2]

The fact that the 2001 Management Policies were not implemented pursuant to formal rulemaking procedures, therefore, does not automatically foreclose the application of *Chevron* deference.  In light of *Mead*, the court must assess whether the 2001 Management Policies are the type of agency decision that Congress intended to "carry the force of law."  *Mead*, 533 U.S. at 221, 121 S. Ct. 2164.

Congress has unquestionably granted the NPS express authority to manage national parks, including the authority to issue regulations which it "deems necessary or proper for the use and management of the [national] parks . . . ."  16 U.S.C. §§ 1, 3.  It is apparent from this express delegation of authority that Congress expects the NPS to "be able to speak with the force of law" when issuing rules of a substantive nature pursuant to formal notice-and-comment procedures.  As the NPS concedes, the 2001 Management Policies were not finalized and adopted pursuant to formal rulemaking procedures.  The court finds, however, that the procedural and substantive  nature of the 2001 Management Policies are so closely analogous to that of a formal regulation, Congress would expect the 2001 Management Policies to carry the force of law.

---

[2] In *Barnhart,* the Court upheld a Social Security Administration ("SSA") rule that defined "disability." The rule was clearly entitled to *Chevron* deference because it was issued through the use of notice-and-comment rulemaking.  The Court, however, citing to *Mead*, stated in dicta that the fact that the Agency previously reached its interpretation through means less formal than notice-and-comment rulemaking did not automatically preclude the application of *Chevron* deference.  The court then stated that in light of the "interstitial nature of the legal question, the related expertise of the Agency, the importance of the question to administration of the statute, the complexity of that administration, and the careful consideration the Agency has given the question over a long period of time," it would have applied *Chevron* deference to the less formal means used by SSA prior to its issuing its legislative rule.

For example, unlike typical informal agency policy manuals, the 2001 Management Policies were implemented after undergoing an almost-complete, formal notice-and-comment process.  The NPS published notice of the availability of the draft Management Policies in the Federal Register and invited comments from the public for a 60-day period.  *See* Notice of Availability of Draft National Park Service Management Policies, 65 Fed. Reg. 2984 (Jan. 19, 2000).  The NPS subsequently reviewed all of the public comments received.  On September 15, 2000, the NPS published the "Notice of New Policy Interpreting the National Park Service Organic Act," giving notice to the public that it was adopting the portion of the Management Policies interpreting the Organic Act's "no-impairment" standard.  65 Fed. Reg. 2984 (Sept. 15, 2000).  The September 15, 2000 Notice explained the legal framework underlying the Management Policies and the purpose for the revisions.  It also included a summary of the public comments received and the NPS's responses to the comments.

The procedures used by the NPS in implementing the 2001 Management Policies do not technically conform to all of the rulemaking requirements set forth in the APA.  *See* 5 U.S.C. § 553.  Most obviously, a concise general statement of basis and purpose was not incorporated into the Management Policies, and the Management Policies were not themselves published in the Federal Register.  *See* 5 U.S.C. §§ 553(c),(d).  The procedures followed by the NPS in implementing the Management Policies, however, satisfy the purpose behind formal rulemaking procedures, which is to "assure fairness and mature consideration of rules . . . ."  *N.L.R.B. v. Wyman-Gordon Co.*, 394 U.S. 759, 764, 89 S. Ct. 1426, 1429, 22 L. Ed. 2d 709 (1969).

Not only are the 2001 Management Policies procedurally similar to formal regulations, they are substantively similar.  Formal agency regulations prescribe substantive rules, not "interpretive rules, general statement of policy, or rules of agency organization, procedure, or practice."  *Chrysler Corp. v. Brown*, 441 U.S. 281, 301, 99 S. Ct. 1705, 1717, 60 L. Ed. 2d 208 (1979); *see also* 5 U.S.C. §§ 553 (b),(d).  "The primary distinction between a substantive rule . . . and a general statement of policy . . . turns on whether the agency intends to bind itself to a particular legal position.  *See Syncor Intern'l Corp. v. Shalala*, 127 F.3d 90 (D.C. Cir. 1997).  In implementing the Management Policies, the NPS made compliance with Management Policies mandatory.  *See* Forward to Management Policies ("[a]dherence to policy will be mandatory . . . ." ).  By doing so, the NPS bound itself to the Management Policies.  *See The Wilderness Socy. v. Gale Norton*, No. 03-64, slip op.,  (D.C.C., Jan. 10, 2005); *Fund for Animals v. Norton*, 294 F. Supp. 2d. 92, 106 n.8 (D.DC. 2003) (holding that NPS's intent to be bound to the Management Policies is clear).  The Management Policies, therefore, are not a general statement of policy, but prescribe substantive rules.

In addition, although the Management Policies are not technically formal regulations, they are procedurally and substantively much closer to a legislative rule than they are to an opinion letter or policy manual.  The Management Policies were implemented pursuant to a "relatively formal administrative procedure tending to foster . . . fairness and deliberation," *Mead*, 533 U.S. 230, 121 S. Ct. 2164, and they have the characteristics of a substantive rule.  Given the importance of the "no-impairment" standard to the NPS's administration of the statute, the expertise of the NPS in managing national parks, and Congress' express intent that

the NPS have the force of law to issue substantive rules pursuant to notice-and-comment rulemaking procedures, the Court finds that the 2001 Management Policies are the type of agency decision Congress intended to "carry the force of law, " and therefore eligible for *Chevron* deference.

> **B.      The Management Policies' Interpretation of the Organic Act's "No-Impairment" Clause Is Permissible.**

Pursuant to *Chevron*, the next "question for the court is whether the agency's answer is based on a permissible construction of the statute."  *Chevron*, 467 U.S. at 843, 104 S. Ct. 2778. In making this determination, the court need not conclude that the NPS's interpretation of the Organic Act's "no-impairment" clause is the only permissible interpretation, or even the best interpretation.  *Id*. at 843 n.1, 104 S. Ct. 2778.  The court must determine only that the interpretation is reasonable and not contrary to congressional intent.  *Id*. at 844-45,104 S. Ct. 2778.

"The Organic Act mandates that the NPS provide for the conservation and enjoyment of the scenery and natural historic objects and the wildlife therein 'in such manner and by such means as will leave them unimpaired for the enjoyment of future generations.'" *Dabney*, 222 F.3d at 826; *see* 16 U.S.C. § 1.  The Organic Act, however, does not define the word "unimpaired" or the phrase "unimpaired for the enjoyment of future generations."  Thus, while the Act clearly directs the NPS to regulate parks pursuant to broad objectives, the agency is left with the task of further defining and applying this standard.  As explained previously, Congress has granted the NPS express authority to manage national parks, including the authority to issue regulations which it "deems necessary or proper for the use and management of the [national]

20

parks . . . ."  16 U.S.C. §§ 1, 3.  Further defining and applying the "no-impairment" standard is

therefore within the NPS's delegation of authority.

     As stated previously, Section 1.4 of the Management Policies sets forth the NPS's

interpretation of the "no-impairment" standard.  The Management Policies recognize that

Congress has given the NPS discretion to allow impacts to park resources and values "so long as

the impact does not constitute impairment of the affected resources and values." § 1.4.3, 2001

Management Policies.  According to the Management Policies, this is the primary responsibility

of the NPS.  *Id.* at § 1.4.4.

     The Management Policies then define "impairment" as:

> an impact that, in the professional judgment of the responsible NPS manager,
> would harm the integrity of park resources or values, including the opportunities
> that otherwise would be present for the enjoyment of those resources or values.
> Whether an impact meets this definition depends on the particular resources and
> values that would be affected; the severity, duration, and timing of the impact; the
> direct and indirect effects of the impact; and the cumulative effects of the impact
> in question and other impacts.

*Id.* at § 1.4.5.

     Although any impact to a park resource or value may constitute an impairment, it is more

likely to constitute an impairment if it affects a resource or value whose conservation is

"[n]ecessary to fulfill specific purposes identified in the establishing legislation . . . of the park;

[k]ey to the natural or cultural integrity of the park . . . [or] [i]dentified as a goal in the park's

general management plan or other relevant NPS documents." *Id*.  Section 1.4.6 broadly defines

the park resources and values that are subject to the "no-impairment" mandate.

USA-ALL contends that Section 1.4 of the NPS's 2001 Management Policies defines "impairment" so broadly that the NPS will manage national parks so as to avoid any impairment, with use and enjoyment being a secondary consideration.  USA-ALL argues that the Organic Act mandates that the NPS balance preservation with public access when making management decisions.  According to USA-ALL, by placing "no-impairment" above "use," the NPS exceeds its statutory authority.  As the Tenth Circuit noted in *Dabney*, however, "[i]t is unclear from the statute itself . . . how both the duration and severity of the impairment are to be evaluated or weighed against the other value of public use of the park."  *Dabney,* 222 F.3d at 826.

The express language of the Organic Act does not, as USA-ALL suggests, mandate that the NPS equally balance preservation with public use in making its management decision.  In fact, the Organic Act specifically mandates that the NPS provide for the conservation and enjoyment of the scenery and natural historic objects and the wildlife therein "in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 16 U.S.C. § 1.  The court finds that the 2001 Management Policies' interpretation of the Organic Act, is not manifestly contrary to the express language of the Organic Act.[3]

In addition, the legislative history of the Organic Act suggests that the "overriding purpose of the bill was to preserve 'nature as it exists.'" *Nat'l Rifle Assoc. of Am. v. Potter*, 628 F. Supp. 903 (D.C. 1986) (citing H. Rep. No. 700, 64th Cong., 1st Sess. 31 (1916)).  Moreover,

---

[3] USA-ALL additionally argues that under the Management Policies' broad definition of "impairment," national parks will be managed as *de facto* wilderness areas.  The court does not agree.  The Wilderness Act defines a wilderness as an area "untrammeled by man" and "without permanent improvements.  16 U.S.C. § 1131(c).  The Management Policies, by contrast, make it clear that NPS managers have the "discretion to allow impacts to park resources and values when necessary and appropriate to fulfill the purposes of the park . . . ."  2001 Management Policies § 1.4.3.

the court finds that the no-impairment interpretation set forth in the Management Policies is not inconsistent with the interpretation given the Organic Act by those officials initially charged with implementing the Organic Act.  The NPS's first management policies, issued by Secretary Franklin K. Lane to Director Stephen T. Mather on May 13, 1918, established "that the national parks must be maintained in absolutely unimpaired form for the use of future generations as well as those of our own time."  *See* Secretary Lane's Letter on National Park Management (May 13, 1918), America's National Park System: The Critical Documents, 48 (Lary M. Dilsaver, ed., 1994).

Furthermore, in 1978, Congress amended the National Park System General Authorities Act, which supplements the Organic Act, to reiterate its intention that the National Park System be administered in furtherance of the "purpose" of the Organic Act.  The amendment then specifically stated that the "protection, management, and administration of these areas shall . . . not be exercised in derogation of the values and purposes for which these various areas have been established."  16 U.S.C. §1a-1.   In addition, the legislative history to this amendment states that "[t]he Secretary is to afford the highest standard of protection and care to the natural resources within . . . the National Park System.  No decision shall compromise these resource values except as Congress may have specifically provided."  S. Rep. No. 95-528 at 13-14 (1977).  The report also states that the Secretary " has an absolute duty, which is not to be compromised, to fulfill the mandate of the 1916 Act to take whatever relief as will safeguard the units of the National Park System."  *Id.*  The amendment to the Organic Act and the legislative history to the

amendment evidence Congress' intent that the parks be managed so as to avoid any "impairment" or "derogation" of park resources and values.

In addition, the majority of courts that have interpreted the "no-impairment" mandate have interpreted it as placing an "overarching concern on preservation of resources." *Dabney*, 222 F.3d at 826; *see also Bicycle Trails Council v. Babbitt*, 82 F.3d 1445, 1453 (9th Cir. 1996) (recognizing that "resource protection [is] the overarching concern" of the Organic Act); *Conservation Law Found. v. Clark*, 590 F. Supp. 1467, 1479 (D. Mass. 1984) (characterizing the Organic Act as having an "overriding preservation mandate").  The Management Policies' interpretation therefore is consistent with over twenty years of federal court decisions confirming that conservation is the predominant facet of the Organic Act.

Next, USA-ALL argues that the interpretation set forth in the Management Policies should be entitled to no deference because it reverses the NPS's longstanding interpretation of the Organic Act without providing a reasoned analysis for such a change.  *See Immigration and Naturalization Serv. v. Cardoza-Fonseca*, 480 U.S. 421, 446 n.30, 107 S. Ct. 1207, 1221 n.30, 94 L. Ed. 2d 434 (1987) (finding that an agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is entitled to less deference that a consistently held agency view).  *See also Motor Vehicle Mfrs. Assn. v. State Farm*, 463 U.S. 29, 57, 103 S. Ct. 2856, 77 L. Ed. 2d 443 (1983) ("An agency's view of what is in the public's interest may change, either with or without a change in circumstances . . . [b]ut an agency changing its course must supply a reasoned analysis . . .").

The court finds that the NPS, however, has provided a reasoned analysis for its change in position.  As part of the NPS's review of its 1988 Management Policies, a question arose as to whether the 1988 Management Policies provided adequate guidance to managers as to the no-impairment clause of the Organic Act.  The NPS notes that several developments indicated that the policy needed further clarification.  First, some NPS Managers interpreted the clause to authorize a balancing that would allow them to impair park resources if necessary to create opportunities for public use and enjoyment.  2001 National Park Service Management Policies: Oversight Hearing Before the Subcomm. on National Parks, Recreation and Public Lands, House Committee on Resources, 107th Cong., 2d Sess. at 12 (2002).   Conversely, the NPS recognized that a number of courts had determined that although the Organic Act provides a balance between resource protection and public use, Congress intended resource protection to be the "overarching concern."  *Id*.

As a result of the diverse and conflicting interpretations given to the "no-impairment" standard, the NPS decided to reevaluate its position.  In doing so, the NPS requested public input, circulated service-wide two draft revisions of the policies, and published for review and comment a third draft.  The NPS determined that because preventing the impairment of resources is its primary responsibility under the Organic Act, Congress intended conservation be the predominant consideration in making management decisions where there is a conflict between conserving resources and providing for the enjoyment of them.  *Id*. at 13; 2001 Management Policies § 1.4.4.  The court finds that this well-considered position, which resolves

conflicting interpretations of the Organic Act in favor of the interpretation given it by a majority

of courts, is reasonable.[4]

In sum, upon review of the express language of the Organic Act and its legislative

history, the 1978 Amendment to the Organic Act and its legislative history, and the

interpretation of the no-impairment mandate taken by the majority of the courts, the court is

satisfied that the interpretation of the "no-impairment" mandate of the Organic Act set forth in

section 1.4 of the 2001 Management Policies is permissible.  The interpretation is entitled to

deference under *Chevron*.[5]   Accordingly, the court finds no merit to USA-ALL's contention that

the NPS's interpretation of the "no-impairment" mandate is in violation of the Organic Act.

## II.     NPS's FINAL RULE DOES NOT VIOLATE THE ORGANIC ACT OR ENABLING ACT.

Having found Section 1.4 of the 2001 Management Policies to be a permissible

interpretation of the Organic Act, the court next addresses whether the Final Rule, which closes

portions of Salt Creek Road to motor vehicle use, is "based on a permissible construction of the

[Organic Act and Enabling Act]."  *Chevron*, 467 U.S. at 843.  USA-ALL asserts that it is not.

---

[4]   The Supreme Court in *Chevron* itself noted that "[t]he fact that an agency has from time to time changed its interpretation of the term 'source' does not, as respondents argue, lead us to conclude that no deference should be accorded the agency's interpretation of the statute.  An initial agency interpretation is not instantly carved in stone. On the contrary, the agency, to engage in informed rulemaking, must consider varying interpretations and the wisdom of its policy on a continuing basis."  *Chevron*, 467 U.S. at 843 n.11, 104 S. Ct. 2778.

[5] The Court finds that in light of the validity of the Management Policies' reasoning and the thoroughness evident in their consideration, they should be given controlling weight regardless of whether they are entitled to *Chevron* deference.  *Martinez v. A.M. Flowers,* 164 F.3d 1257 (10th Cir. 1998) (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S. Ct. 161, 89 L. Ed. 124 (1944) (informal agency interpretations of statutes are entitled to respect if they are "well reasoned" and have the "power to persuade")).

As explained previously, the Organic Act mandates that the NPS provide for the conservation and enjoyment of the scenery and natural historic objects and wildlife therein "in such manner and by such means as will leave them unimpaired for the enjoyment of future generations."  16 U.S.C. § 1. While the Organic Act directs the NPS to regulate the parks pursuant to these broad objectives, it is silent as to the specifics of park management.  The Organic Act instead explicitly delegates to the NPS the authority to determine which avenues best achieve the Organic Act's mandate.  16 U.S.C. § 3 (granting the NPS authority to make such rules as is deems "necessary or proper for the use and management of the parks"); *see also Isle Royale Boaters Ass'n v. Norton*, 330 F.3d 777, 782-83 (6th Cir. 2003); *Bicycle Trails*, 82 F.3d at 1454.  Legislative regulations formulated pursuant to this delegation of authority "are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute."  *Chevron*, 467 U.S. at 844, 104 S. Ct. 2778.

Section 1.4 of the Management Policies, to which this court gives deference, provides that the primary responsibility of the NPS under the Organic Act is to ensure that park resources and values remain unimpaired.  The NPS, having determined that closing Salt Creek Road above Peekaboo campsite to vehicular use is necessary to prevent the impairment of a park resource, *i.e.*, the Salt Creek riparian/wetland ecosystem, implemented the Final Rule.  The court finds that this decision falls well within the NPS's broad grant of discretion and constitutes a permissible interpretation of the Organic Act and the Enabling Act (sometimes referred to as the "Acts").

Neither the Organic Act nor the Enabling Act expressly addresses the precise issue of preventing motor vehicle access on park roads.  The NPS's decision to close Salt Creek Road to

27

prevent the impairment of a park resource, therefore, does not contradict the express language of these acts.

As USA-ALL points out, however, the legislative history of the Enabling Act indicates that Congress authorized the NPS to use pre-existing four-wheel drive roads, including Salt Creek Road, for access to the remote areas of Canyonlands.[6]  S. Rep. No. 88-381 at 3-4 (1963) (providing that existing rough jeep tracks will "become access roads to the proposed parks). Congress also authorized the NPS to construct necessary access roads.  H.R. Rep. No. 88-1823, *reprinted in*, U.S.C.C.A.N. 3718, 3720.  While the legislative history illustrates congressional intent that the NPS be allowed to use existing jeep tracks as access roads, "nothing in the statutory language indicates that a jeep trail cannot be closed if closure is deemed necessary for preservation."  *Dabney*, 222 F.3d at 826 n.6.  Thus, the court finds that the NPS's decision to close an access road to prevent impairment of a park resource does not contravene clear congressional intent.

USA-ALL next asserts that the Final Rule violates the Organic Act and the Enabling Act because it seeks to protect a park resource that Congress specifically intended not be protected. USA-ALL argues that Congress' intent is evidenced by the fact that it specifically mentioned establishing Canyonlands because of Angel Arch and other unsurpassed geological features,

---

[6]  USA-ALL specifically argues that the Final Rule constitutes a change in position because the NPS always interpreted this language as Congressional authorization for the continued use and enjoyment of the pre-existing four-wheel drive road system, including Salt Creek Road.  The court finds that this is not a case in which the NPS has changed its policy.  In fact, the Final Rule specifically notes that despite the closure of Salt Creek Road above Peekaboo campsite, "[r]oads elsewhere in the Needles District, as well as elsewhere in Canyonlands National Park, remain open to motorized vehicles."  62 Fed. Reg. at 32,872.  Rather, as in *Northwest Motorcycle Assoc. v. U.S. Dept. of Agriculture.*, 18 F.3d 1468, 1480 (9th Cir. 1994), the NPS modified a "plan" to further the existing policy of preventing the impairment of park resources.

while never mentioning the Salt Creek riparian/wetland ecosystem.  *See* H.R. Rep. No. 88-1823,

*reprinted in*, 1964 U.S.C.C.A.N. 3718, 3719.  USA-ALL also points to the fact that Congress

knew that Salt Creek Road crossed Salt Creek in many locations, yet specifically authorized the

NPS to turn existing jeep tracks into access roads.  *See* S. Rep. No. 88-381 at 3-4 (1963).

        The court does not find USA-ALL's reference to selected excerpts of legislative history

persuasive in light of the express language of the Acts.  Canyonlands was established as a

National park "to preserve an area in the State of Utah possessing superlative scenic, scientific,

and archaeologic features . . . ."  16 U.S.C. § 271.  Congress also directed that Canyonlands be

"exercised in accordance with the provisions of [the Organic Act] whose 'fundamental purpose'

includes 'conserv[ing] the scenery and the natural and historic objects and wild life" in the park.

16 U.S.C. §§ 1, 271d.  Based on the express language in the statutes, it is clear Congress

intended to preserve and protect not only the geologic features of Canyonlands, but its natural,

scientific, and scenic values as well.  The NPS's determination that the Salt Creek

riparian/wetland ecosystem is a park resource does not contradict this express intent.

        In addition, Section 1.4 of the Management Policies, to which the court previously

determined deference must be given, defines the Organic Act as protecting from impairment a

broad array of "park resources and values," including natural landscapes, water and air

resources, soils, geological resources, native plants and animals.  2001 Management Policies §

1.4.6.  The Management Policies also state that an impact is more likely to constitute an

impairment to the extent that if affects a resource or value whose conservation is "key to the

natural or cultural integrity of the park or to opportunities for enjoyment of the park . . . ."  *Id*.  §
1.4.5.

The NPS, in reference to its Management Policies, determined that the Salt Creek
riparian/wetland ecosystem is a park resource whose conservation is key to the natural integrity
of the park.  USA-ALL, however, contends that there is no evidence in support of this
determination.  The court disagrees, finding that the Administrative Record amply supports this
finding.

The Salt Creek EA specifically found that based on the estimates of surface and ground
water and riparian vegetation acreage, Salt Creek supports the most extensive riparian area in
Canyonlands other than the Green and Colorado Rivers.  The Salt Creek EA also found that
surface water and riparian habitat are among the rarest habitat types in the arid Canyonlands
environment and are particularly important to wildlife.  The evidence shows that Salt Creek
supports the richest assemblage of birds and vertebrate wildlife in the park, outside the river
corridors.  Based on this evidence, the court finds that the NPS's finding that the Salt Creek
riparian/wetland ecosystem is a "key" resource is amply supported.  The fact that the Final Rule
protects the impairment of the Salt Creek riparian/wetland ecosystem is therefore not a violation
of the Organic Act or the Enabling Act.

USA-ALL next claims that the Final Rule violates the Organic Act and Enabling Act
because it deprives the public of its ability to use and enjoy significant portions of Canyonlands.
The Final Rule was issued, however, pursuant to the Organic Act's mandate that park resources
be managed "unimpaired for the enjoyment of future generations."  16 U.S.C. § 1.

As discussed above, the court gives deference to the NPS's interpretation of this phrase. Section 1.4 defines "impairment" as prohibiting "an impact that, in the professional judgment of the responsible NPS manager, would harm the integrity of park resources or values . . . ."  2001 Management Policies § 1.4.5.  Whether an impact meets this definition "depends on the particular resources and values that would be affected; the severity, duration, and timing of the impact; the direct and indirect effects of the impact; and the cumulative effects of the impact in question and other impacts."  *Id.*  An impact is more likely to constitute an impairment to the extent it affects a resource or value whose conservation is "key to the natural or cultural integrity of the park . . . ." *Id.*

The NPS, relying on this interpretation of "impairment," determined that vehicular traffic in Salt Creek Canyon constitutes an impairment to the Salt Creek riparian/wetland ecosystem. The court finds that the evidence in the Administrative Record fully supports this determination, as discussed more fully below.  The Salt Creek EA determined that vehicular traffic, even on a part-year permit system, would put Salt Creek Canyon at risk of a major erosion and degradation, rendering the flood area nonfunctional, from a flood of a magnitude which recurs regularly.  Based on this evidence, the NPS determined that the potential major indirect adverse impacts that would result to this "key" resource constitute an "impairment."  Thus, the court finds that the Final Rule, which prohibits motor vehicle use on Salt Creek above Peekaboo campsite in order to prevent the impairment of the Salt Creek riparian/wetland ecosystem, is supported by sufficient evidence and is a permissible construction of the statute.

Having found that the Final Rule is supported by sufficient evidence and therefore permissible under the Acts, the court rejects USA-All arguments that the Final Plan should be set aside as arbitrary and capricious because it (1) constitutes an unsupported change in position from the 1995 BMP, (2) fails to consider the impact on Salt Creek from future non-motorized use, and (3) fails to consider evidence provided by the State of Utah and San Juan County that Salt Creek Road is an R.S. 2477 right-of way.  As discussed below, the court finds no merit to these arguments.

     A.    *The Final Plan Does Not Constitute an Impermissible Change in Position.*

USA-ALL argues that the NPS's decision to prohibit motor vehicle use in Salt Creek Canyon, as opposed to implementing the BMP's limited use permit system, is an arbitrary change in position.  As the NPS explained in its Final Rule, however, it decided to re-examine the impacts of motorized vehicles on the Salt Creek riparian environment in light of several important changes.

First, the period during which the NPS was enjoined from allowing motor vehicle use above Peekaboo campsite was the first period of significant length since the Park's inception that Salt Creek Road had been without vehicle traffic.  Consequently, it was possible for the NPS, as well as independent researchers, to monitor Salt Creek's riparian conditions when not subject to motor vehicle use.  New scientific information regarding the impact of vehicles on Salt Creek's riparian ecosystem was gathered during this monitoring period.  In addition, the NPS implemented Section 1.4 of its Management Policies, thereby setting forth an agency-wide interpretation of the Organic Act's "no-impairment" mandate.  Then, in early 2001, the U.S. Fish

and Wildlife Service designated Salt Creek Canyon as critical habitat for the threatened Mexican spotted owl.

In light of these changes, and because the BMP was an interim action intended to last for only five years, the NPS decided to initiate a new environmental assessment process on Salt Creek access.  The court finds that re-examination of the issue in light of these changed circumstances is not unreasonable.

USA-ALL also asserts that the evidence does not support this change in position and that the evidence in the record actually refutes a claim that Salt Creek will be impaired as a result of motorized vehicle use.   In making this assertion, USA-ALL relies upon the Salt Creek EA's finding that since people started driving up Salt Creek in the 1950's, Salt Creek has actually improved from a "nonfunctional condition"(*i.e.*, an area lacking adequate vegetation, landform, or woody debris to dissipate stream energy associated with high flows) to a "functional-at risk condition" (*i.e.*, an area with soil, water, or vegetation attributes that make it susceptible to degradation).  USA-ALL argues that the fact that Salt Creek has significantly improved its condition while being traveled upon by vehicles shows that motorized vehicle use will not "impair" Salt Creek.

USA-ALL's argument, however, is not reasonable in light of the totality of the evidence. Although the Salt Creek EA does state that there has been improvement in the riparian quality of Salt Creek despite motor vehicle use, it attributes this improvement primarily to the cessation of grazing in the mid-1970's.  The Salt Creek EA then specifically states that although the sections of Salt Creek still subject to vehicle travel have improved in condition since the 1950's, vehicle

33

travel appears to be holding recovery in check.  The evidence shows that the portion of Salt

Creek that has remained open to vehicular traffic has remained in a static functional-at risk

condition.  In contrast, the portion of Salt Creek which has been closed to vehicular traffic has

improved to a functional-at risk condition with an upward (improving) trend, and the portion

above the Angel Arch turnoff which has been without vehicle traffic for twenty-five years has

recovered to a properly functioning condition.

The Salt Creek EA attributes this difference in conditions to vehicle impact.  This

conclusion is supported by the fact that a setback in the improvement in condition of the area

above Peekaboo Campsite could be seen after an unauthorized vehicle trip involving only four

vehicle passes.  The Salt Creek EA concludes that vehicle travel on Salt Creek Road will hold

Salt Creek's recovery in check, keeping it from reaching a properly functioning condition, *i.e.*, a

condition in which the channel network adjusts in form and slope to handle increases in

stormflow/snowmelt runoff with minimal disturbance of channel and associated riparian-wetland

plant communities.

The result of remaining at a functional-at risk condition with no upward trend is that

there is a continuing risk of indirect, major impact as a result of a flood event of a magnitude that

recurs regularly.  Such a flood could degrade the riparian system to a nonfunctional condition.

This major indirect impact would result in the long term because recovery time increases

considerably when riparian areas become nonfunctional.

The Salt Creek EA states that allowing motor vehicle access on Salt Creek Road, even

under a part-year limited permit system, would prevent the riparian area between Peekaboo

34

Campsite and Angel Arch from reaching a properly functioning condition,[7] and would leave it vulnerable to major erosion or degradation.  The record indicates that a portion of Salt Creek above Peekaboo Campsite is particularly vulnerable to degradation in light of an existing area of erosion.  The erosion and degradation that would result from a commonplace flood would have major impacts on the functional condition of the riparian area, the amount of riparian area disturbed, and water quality.

The court finds that the evidence in the record amply supports the NPS's determination that motor vehicle use on Salt Creek Road would cause "impairment."  This evidence, in addition to the substantial changes since implementation of the BMP, provides a reasoned analysis for the Final Rule's change in position.  The court cannot find such agency action to be arbitrary and capricious.

B.      The NPS Considered the Impact of Non-Motorized Use on Salt Creek.

USA-All argues that the Final Rule is arbitrary because the NPS failed to consider the potential impacts on park resources that might be caused if closure to vehicular traffic leads to an increase in hiking and backpacking.[8]  The Salt Creek EA, however, specifically addresses the

_____

[7]      As USA-ALL points out, there is no requirement that riparian areas in national parks reach "properly functioning condition."  The Salt Creek EA's management objective was not to achieve the properly functioning condition of Salt Creek, but to provide recreational access to Salt Creek without causing major adverse impacts or impairment of park resources and values.  The Properly Functioning Condition approach was simply the method used by the NPS to analyze the existing riparian condition of Salt Creek and the potential risks to Salt Creek under the various management alternatives proposed in the Salt Creek EA.  The fact that a riparian area is not in "properly functioning condition" does not, as USA-ALL argues, pre-determine that it is "impaired."  The court finds that there is adequate evidence in the administrative record, however, to support the Salt Creek EA's determination that if the Salt Creek riparian/wetland ecosystem is not restored to a properly function condition, it will remain at continuing risk of a major indirect adverse impact.

[8]      USA-ALL additionally argues that the Final Rule is arbitrary because it prohibits motorized vehicle access on Salt Creek Road only above the Peekaboo campsite.  The fact that vehicle use below Peekaboo campsite may be

potential for increased hiking and backpacking and concludes that the potential impacts from such increased use will not cause major direct, indirect or cumulative impacts or impair park resources or values.

The Salt Creek EA specifically noted that there is a potential for increased backpacking as a result of prohibiting motor vehicle use above Peekaboo campsite. The Salt Creek EA determined, however, that any potential impacts are mitigated by the BMP's existing restrictions on backpack camping. The Salt Creek EA also analyzed the potential impacts that any increased hiking may have on archeological cultural resources. The Salt Creek EA found that while there would be continued pedestrian ground trampling, it would not involve degradation of any archeological cultural resources. The Salt Creek EA also determined that because no coliform bacteria has been detected, even during the busiest months since the vehicle prohibition, increased hiking and backpacking would have no effect on water quality. In light of this evidence, the court concludes that the NPS did not fail to consider the impact of an increase in non-motorized use on park resources.

C.    *The NPS Considered the State of Utah and San Juan County's RS-2477 Right-of-Way Claim.*

USA-ALL lastly asserts that the Final Rule is arbitrary and capricious because the NPS failed to consider evidence submitted by the State of Utah and San Juan County in support of their R.S. 2477 right-of-way claim.[9] An examination of the record reveals that although the NPS

_____

impairing park resources does not provide a basis for disturbing the Final Rule's finding of impairment above the campsite, which is clearly supported by the record.

[9]    The evidence to which USA-All refers was filed on August 19, 2002 in the above-captioned action by the State of Utah and San Juan County in support of their Partial Motion for Summary Judgment. The court determined that it

may not have considered the exact evidence submitted by the State of Utah and San Juan

County, it fully considered whether there was an R.S. 2477 right-of-way in Salt Creek Canyon

prior to completing the EA.  The record shows that as part of its analysis, the NPS requested

from San Juan County all information relevant to the County's claim, and San Juan County

provided the NPS with five affidavits.  The NPS conducted an extensive document review which

included a review of the affidavits provided by San Juan County, historic maps, aerial

photographs, park records, planning documents, public lands records, public land survey records,

and road maintenance records.  The NPS additionally conducted field inspections on the claimed

right-of-way to look for on-the-ground features that might indicate road construction or

improvement.  The NPS also conducted interviews of a number of individuals who had been in

Salt Creek Canyon prior to the establishment of Canyonlands in 1964.  Based on this assessment,

the NPS concluded that the information did not establish the existence of an R.S. 2477 right-of-

way.

Although the evidence submitted by the State of Utah and San Juan County in support of

their Partial Motion for Summary Judgment in this action may not have been considered in the

administrative process, there is nothing to suggest this evidence was "overwhelming" or set forth

significant new information.  In fact, all but one of the affidavits submitted by San Juan County

---

did not have jurisdiction to entertain the Partial Motion for Summary Judgment and dismissed the State of Utah and San Juan County from the above-captioned action.  *See* January 14, 2003 Order, Case No. 2:95CV559 (D. Utah, Jan. 14, 2003).  The actual question of whether San Juan County has a valid R.S. 2477 claim is currently being addressed in a quiet title action before a different judge in this court.  *See San Juan County v. United States*, Case No. 2:04 CV552 (D. Utah, filed June 16, 2004).  This court's determination has no bearing on whether San Juan County has a valid R.S. 2477 claim.

in support of its motion were by affiants whom the NPS had already informally interviewed. Based on the evidence, it is clear the NPS did not "entirely fail[] to consider an important aspect of the problem." *Motor Vehicle Mfrs. Assn. v. State Farm*, 463 U.S. 29, 43 (1983).  Thus, USA-ALL's contention related to this issue is without merit.

## III.  SUMMARY

USA-ALL's challenges to the NPS's 2001 Management Policies and to the Final Rule fail.  The NPS's Management Policies, upon which the NPS relied in implementing the Final Rule, have been expressed in a sufficiently binding format through the agency's congressionally delegated power so as to be worthy of *Chevron* deference.  Even if the Management Policies were not entitled to *Chevron* deference, the court would give them controlling weight in any event because they are well reasoned, thorough, and persuasive.  Additionally, the court finds that the Management Policies' interpretation of the Organic Act's "no-impairment" mandate is permissible under the Organic Act, and, accordingly, that the Management Policies do not violate the Organic Act.  The court also finds that the Final Rule, which prohibits motor vehicle use in Salt Creek Canyon above Peekaboo campsite, is based upon a permissible construction of the Organic Act and Enabling Act and is supported by the Administrative Record.

## <u>CONCLUSION</u>

For the foregoing reasons, IT IS HEREBY ORDERED that the relief requested in USA-ALL's administrative appeal is DENIED.  The court finds that the 2001 Management Policies are a permissible construction of the Organic Act and that the Final Rule prohibiting motor vehicle use in Salt Creek Canyon above Peekaboo campsite is consistent with the Organic Act

and the Enabling Act.

DATED this 12th day of September, 2005.

BY THE COURT:

_____
DALE A. KIMBALL
United States District Judge